## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**GWENDOLYN ARCHIBALD,**

    **Plaintiff,**

**v.**                                                                 **Civil Action No. 2:04cv489**

**TIDEWATER COMMUNITY COLLEGE,**

    **Defendant.**

### MEMORANDUM OPINION AND ORDER

Plaintiff Gwendolyn Archibald ("Archibald") brought suit against her employer, Defendant Tidewater Community College ("TCC"), for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.  Now before the Court is TCC's Motion for Summary Judgment (the "Motion").  For the reasons that follow, the Motion is **GRANTED** and it is **ORDERED** that judgment be entered in favor of TCC.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Prologue

This case involves events extending over the course of a couple of years involving several individuals and events.  As with most cases involving employment discrimination, the outcome is driven by facts (and, of course, the application of the law to those facts).  Due to the time expanse and the number of individuals involved, it is challenging to keep track of who is associated with which party, what those individuals claim took place, and what source in the

1

record their claims are derived from.  Thus, as a reading aid, two appendices are included in this opinion.  Appendix A contains a list of the documents submitted by the parties that are cited in this opinion.  The list indicates the short citation of each document and where it may be found in the record in order to eliminate unwieldy citations from the text of the opinion.  Appendix B contains a chart depicting the relevant hierarchy in the TCC Human Resources Office (based on the evidence presented to the Court), which may serve as a useful reference.  With that, we turn to a recital of the relevant facts and discussion of the applicable law.

### B.   Factual Summary

#### 1.   Archibald's Journey to the TCC Human Resources Department

Prior to joining TCC, beginning in 1991, Archibald was a Payroll Manager at Norfolk State University ("NSU").[1]  During her employment with NSU, Archibald accumulated two written disciplinary notices for unsatisfactory job performance, one on March 25, 1997, and the other on October 24, 1997.  (See NSU Disciplinary Notices.)  In a letter dated October 23, 1997, Archibald was advised that her "job performance in [the matter leading to the second disciplinary notice was] unsatisfactory and will not be tolerated.  You have jeopardized the credibility of this department." (Turnbull Letter to Archibald.)  Archibald was subsequently warned on October 31, 1997 that if she received a third written disciplinary notice, NSU policy would ordinarily call for her termination.  (Carter Memo.)  Four days later, on November 3, 1997, Archibald submitted

---

[1] An examination of the factual record presented to the Court reveals a seven-year gap in Archibald's employment history.  Archibald graduated from high school in 1981 and did not attend college.  See infra note 3.  The first job she claims to have held is as an Accounting Manager for Commonwealth College beginning in January 1988.  Seven years worth of Archibald's employment history is therefore unaccounted for within the factual record.  Compare infra note 3 with Def.'s First Set of Interrogatories ¶ 3.

2

an employment application to TCC, which offered her a position within its Payroll Office.  See infra note 3.  On December 17, 1997, about six weeks after being warned that she was walking a thin line at NSU, Archibald submitted a letter of resignation, effective January 9, 1998. (Archibald Resignation Letter.)  According to Archibald, she departed NSU because she was getting married and her husband intended to build a house in Suffolk, Virginia (though moving to TCC resulted in about a $1,000 pay cut).  (Archibald Depo. at 24; see also id. at 22-36 (addressing Archibald's prior employment).)[2]  TCC was, amazingly, apparently unaware of Duncan's disciplinary history at NSU when it hired her.  (Duncan Aff. ¶ 3.)

Archibald joined TCC as a Fiscal Technician Senior in the Payroll Office in January 1998.[3]  (Def.'s First Set of Interrogatories ¶ 3; Duncan Aff. ¶ 3.)  Sometime prior to the Fall of 1998, Archibald began having problems with her immediate supervisor, Stephanie Kuebler, due to Archibald's alleged tardiness and other performance related issues.  (Duncan Aff. ¶ 4; see also DiCroce Memo. (Oct. 21, 1998) (indicating that Archibald and Kuebler's problems dated back to

---

[2]In addition to her two disciplinary notices, Archibald also received a lackluster performance evaluation at around the same time.  In particular, her supervisor indicated that Archibald's strained "interpersonal relationships" with fellow staff members caused her work performance to suffer.  See (NSU Performance Evaulation (Oct. 20, 1997).)

[3]Archibald is a graduate of Booker T. Washington High School in Norfolk, Virginia.  Her application for employment with TCC, which she signed and dated November 3, 1997, states that she attended TCC between 1982 and 1986, logging 90 credit hours.  However, Archibald never attended TCC or any college at all.  The only explanation she provides for this discrepancy is that she had friends assisting her on her application and resume.  (Compare Def.'s First Set of Interrogatories ¶ 2 with Archibald Employment App. & Resume (Nov. 7, 1997) and Archibald Depo. at 19; 38-40.)  This revelation not only calls Archibald's veracity into question, but calls for closer scrutiny of employment applications by TCC.  That is especially the case here, where Archibald's application and resume represent that she attended the very institution where she was hired to work.  (See Duncan Aff. ¶ 3 (indicating that she only learned that Duncan's employment application and resume were inaccurate during discovery for this litigation).)

February 1998).)  Archibald approached Director of Human Resources Nancy Duncan to address

the problem, which Archibald believed stemmed from racial discrimination.  (Archibald Depo. at

43, 47.)  Duncan explained to Archibald the internal grievance procedure and assisted her in

filing a grievance on September 9, 1998.  (Id.; Duncan Aff. ¶ 4; Archibald Internal Grievance.)

To further aid Archibald, Duncan sent all the employees involved to a seminar on supervisory

skills and moved Kuebler to a different area in the office.  (Archibald Depo. At 47.)

Archibald's grievance against Kuebler was investigated by Vice-President for Finance

Phyllis Milloy,[4] who determined that there was no evidence of racial discrimination.  (Milloy

Grievance Response at 3 (Sept. 28, 1998); Milloy Aff. ¶ 3.)  Milloy nonetheless recommended

that Archibald be transferred to another department.  (Id.)  TCC President Deborah DiCroce

subsequently conducted an independent inquiry of the grievance, including holding a meeting

with Kuebler and Archibald on October 20, 1998.  (DiCroche Memo. (Oct. 21, 1998).)  DiCroce,

on the advice of Milloy, decided that the most appropriate course was to transfer Archibald to a

new position so that she could get "a new beginning at Tidewater Community College."  (Id.)

Archibald herself hoped for a new beginning and, though she did not get her first choice job, was

satisfied with the transfer.  (Archibald Depo. at 48.)  Archibald was transferred to the Human

Resources Office ("HRO"), where she became an HR Analyst.[5]  (Milloy Aff. ¶ 4; Duncan ¶ 5.)

She was permitted to maintain her "grade eight" classification, even though most individuals in

---

[4]At the time, Vice-President Milloy's title was Dean of Finance and Administrative Services.  (Milloy Aff. ¶ 1.)

[5]Actually, at the time of the initial move to the HRO, Archibald's title was "HR Practitioner."  Reforms in 2000 caused the HR Practitioners to be reallocated upwards to "HR Analyst" positions, which, at the time, entitled Archibald to an approximately 9.3% salary increase (from $32,653 at the time to $35,690).  (See TCC Pay Action Summary.)

that position had a "grade seven" classification, and maintained her same salary, which was a grade higher than a seven.  (Id.) Her immediate supervisor, at the time was Kathleen Williamson. (Duncan Aff. ¶ 5.)

### 2.     The Pay Increase Controversy and Alleged Discrimination

In early October 2002, an HR Analyst assigned to benefits announced her retirement, effective January 2003.  Duncan therefore called a meeting with the HRO staff to seek out assistance in covering the responsibilities of the retiring employee.  Due to her experience, Archibald was asked and agreed to accept new responsibilities left unfulfilled by the retirement, which she assumed almost immediately.  (See Duncan Aff. ¶ 7; Archibald Aff. ¶ 2; Archibald Depo. at 54-55.)

At around the same time, in February 2003, another HR Analyst Brenda Johnson, who is black, was promoted to the position of HR Benefits Manager.  (Duncan Aff. ¶ 8; Johnson Aff. ¶ 1.) Johnson became Archibald's immediate supervisor.  (Duncan Aff. ¶ 8; Johnson Aff. ¶ 2.) According to Johnson, Archibald was resistant to her supervision attempts.  (Johnson Aff. ¶ 3.) This may have been because Archibald believed that Johnson was unqualified for the job.  (See Archibald Depo. at 64-66.)  Thus, from the outset, Archibald had a rocky relationship with Johnson.

Near the same time that Johnson was promoted, in February 2003, Archibald approached Duncan to inquire whether she could receive a pay increase for accepting additional responsibilities.  (Duncan Aff. ¶ 9.)  Duncan informed Archibald that she was not eligible for a pay increase at that time because she had not had the new responsibilities long enough.  (Id.)  A few months later, in the Spring of 2003, Archibald approached Johnson about the possibility of

getting a raise.  (Johnson Aff. ¶ 4.)  Johnson consulted with Williamson, the Compensation and

Classification Manager, and Duncan.  (Id.)  Since Archibald had undertaken the new

responsibilities for six months, TCC policy permitted consideration of a pay increase.  (Duncan

Aff. ¶ 9.)  Pursuant to Williamson's instructions, Johnson completed a Pay Action Worksheet, on

which she indicated that 10% was the maximum allowable raise.  (Johnson Aff. ¶ 4; Williamson

Aff. ¶ 3.)  Archibald viewed the Pay Action Worksheet and claims that Johnson and Williamson

promised her that she would receive a 10% pay increase.  (See Archibald Aff. ¶¶ 4-6; Archibald

Depo. at 67-68, 89-93.)  This alleged promise is disputed.

Regardless of what they may or may not have told Archibald, the HR Managers–Johnson

and Williamson–did not have authority to give Archibald a pay increase.  In fact, even Duncan

and Milloy, Johnson and Williamson's supervisors, did not have that authority.  Instead, TCC

policy requires the HR Director–Duncan–to make a recommendation to the Vice-President of

Finance–Milloy–who in turn makes a recommendation to the central office of the Virginia

Community College System ("VCCS") in Richmond, Virginia.  This system ensures that the

HRO, which manages pay issues, does not give its own personnel disproportionate raises.  (See

Duncan Aff. ¶ 9; Milloy Aff. ¶ 9.)

In accordance with accepted protocol, Duncan conferred with Johnson and Williamson

about Archibald's pay increase.  Collectively, they decided to recommend that Archibald receive

a 5% raise.  (See Williamson Aff. ¶¶ 3, 9; Johnson Aff. ¶¶ 4-6; Duncan Aff. ¶ 10.)  They passed

their recommendation on to Milloy, who concurred with their reasoning for recommending a 5%

raise.  (Milloy Aff. ¶ 4.)  The reasons for the collective recommendation that Archibald be given

a 5% raise were these: (1) the duties involved in Archibald's new position were not substantially

different from her prior duties; (2) a 10% increase would have resulted in Archibald having a

higher than average salary for HR Analysts in the State; (3) only 28% of pay increases at TCC are

10% or more and the average in-band adjustment, the type of pay action Archibald sought, is

6.59%, which, in light of the first two reasons, render a 5% increase appropriate; and, lastly (4) if

Archibald received a 10% increase in salary when she was working for Johnson, her increased

salary would have been higher than boss's, Johnson.  (See Milloy Confidential Memo. to

Archibald; Milloy Aff. ¶ 4; see also Williamson Aff. ¶ 3; Williamson Memo. to Duncan; Duncan

Aff. ¶ 9; Johnson Aff. ¶ 4.)  A list of the salaries, races, and years of experience of the HR

Analysts is included in Appendix B.

As is explained in more detail in the analysis of Archibald's claims, see supra Part III.A.3,

Archibald believes that she was entitled to a 10% pay increase and claims that Williamson and

Johnson promised one to her.  (See Archibald Aff. ¶¶ 4-6; Archibald Depo. at 67-68, 89-93.)

She believes that Duncan, and by extension Milloy, changed the recommendation on the Pay

Action Worksheet from 10% to 5% on account of her race.  (Archibald Aff. ¶ 1; Archibald Depo.

at 91; Def.'s First Set of Interrogatories ¶ 5.)  On June 9, 2003, Milloy met with Archibald to

explain why she believed a 5% pay increase was appropriate.  (Milloy Aff. ¶ 4; see also Milloy

Confidential Memo. to Archibald.)  Upset over what transpired, Archibald ultimately decided to

reject the pay increase and requested that she be returned to her old duties.  (Archibald Depo. at

108-09; Duncan Aff. ¶11; Milloy Aff. ¶ 4.)  Two days later, on June 11, 2003, Milloy met with

Archibald again and offered to forward all of the information concerning the pay increase,

without a recommendation, to the VCCS central office in Richmond, Virginia to let the powers

that be determine what pay action would be appropriate.  (Milloy Aff. ¶ 4.)  Archibald refused

that offer.  (Id.; Archibald Depo. at 111-14.)  Two weeks later, on June 25, 2003 Milloy met with

Archibald again to discuss Archibald's request to resume her former responsibilities.  (Milloy

Aff. ¶ 4.)  Milloy informed Archibald that returning to her old responsibilities would make her

ineligible for a pay increase.  (Id. )  Duncan informed Archibald of the same in a separate

conversation.  (Duncan Aff. ¶ 11.)  Archibald persisted in and was granted her request

nonetheless.  (Archibald Depo. at 111-14; Milloy Aff. ¶ 4; Duncan Aff. ¶ 12.)  On July 9, 2003,

she filed an Equal Employment Opportunity ("EEO") grievance alleging that she was the victim

of race discrimination.  (See EEO Grievance I.)

### 3.     The Micromanagement Controversy and Alleged Retaliation

During August and September of 2003, Archibald was absent from work on sick leave.

(Archibald Depo. at 120-22.)  While she was away, in early September 2003, Williamson

departed for a new job at Old Dominion University and John Kunz was hired as the new

Compensation and Classification Manager.  (Duncan Aff. ¶ 14.)  Kunz became Archibald's

immediate supervisor.  (Id.)  Archibald was the only subordinate Kunz supervised during the

time period relevant to this lawsuit.  (Kunz Aff. ¶ 5.)

Early in 2004, Duncan began an examination of the productivity level of the HRO.  Based

on feedback from the HR Managers, Duncan became aware that HR staff routinely arrived late

and left early, abused leave policies, spent prolonged periods of time away from their

workstations, and engaged in personal telephone calls on an excessive basis.  Among the steps

she took to ascertain the extent of "time theft" within the HRO was to examine phone logs

between January 27 and March 25, 2004.  The phone logs revealed time theft to be a real

problem in the HRO.  To address the productivity problems, Duncan called an all-staff meeting

on April 23, 2004, where she admonished the HR staff to "work smarter, not harder," by not abusing leave time, limiting absences from their work stations, and reducing personal phone usage.  Duncan informed the staff that the phone logs had been examined and that individual staff members would be contacted by their HR Manager if their personal phone use was excessive.  (See Duncan Aff. 15; Kunz Aff. ¶ 4; Johnson Aff. ¶ 8; Duncan Talking Points (Apr. 23, 2004); Archibald Depo. at 137-38.)

Archibald turned out to be among the most egregious users of the telephone for personal calls.  During the two-month period that the phone logs were examined, there were ten days where Archibald had made more than 20 personal calls per day, 20 days where she had utilized the phone for over 45 minutes for personal reasons, and 18 days where she had made at least two calls lasting over ten minutes in length.  (Kunz Aff. ¶ 5; Phone Logs.)  Kunz met with Archibald to address her excessive personal phone use.  When confronted with these data, Archibald denied wrongdoing.  (See Kunz Aff. ¶ 5; Kunz Memo. for the Record I (Apr. 23, 2004); see also Archibald Depo. at 138-39.)  Kunz instructed Archibald to limit her personal phone calls to those that were absolutely necessary.  (Id.)

Rather than repair her personal phone usage, Archibald resorted to using her cell phone instead of TCC's phones.  (Kunz Aff. ¶ 6; Kunz Memo for the Record II (May 6, 2004); see Archibald Depo. at 142-44.)  This prompted Kunz to repeat his admonishment and warning to Archibald on May 6, 2004.  (Id.)  In her deposition, Archibald admits to using the telephone for personal reasons "just like everybody else in the office [did]."  (Archibald Depo. at 139-40.)  Though she never admitted to an exact amount of time, Archibald testified that somewhere around 50 minutes a day, or five ten-minute phone calls, would be a reasonable amount of time

to spend on the phone for personal reasons.  (Archibald Depo. at 142.)

On June 1, 2004, Archibald filed an EEO grievance alleging that Kunz's monitoring of her phone use specifically, and more her work productivity more broadly, along with other events that took place within the HRO, see further discussion of related facts infra Part III.B, was so severe that it created a hostile work environment.  The grievance alleged that Kunz micromanaged her, at the behest of Duncan, see infra note 16, in retaliation for the July 9, 2003 EEO grievance.  (See EEO Grievance II.)  The July 9, 2003 and June 1, 2004 EEO grievances brought rise to the present lawsuit.

### C.      Archibald's Complaint and Substantive Causes of Action

In her Amended Complaint, Archibald identifies the whole of Title VII as the source of substantive law under which she claims to be entitled to relief.  Nowhere in the pleadings, however, does Archibald identify the specific statutory provisions that would impose liability on TCC if she managed to prove her factual allegations.

It is the case that, "[u]nder the liberal pleading requirements of the Federal Rules of Civil Procedure, it is not necessary for a plaintiff to set out in detail the facts upon which her claim is based.  All that is required in a pleading is a 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227 (4th Cir. 1998) (quoting Fed. R. Civ. P. 8(a)(2)) (involving race discrimination and retaliation claims).  However, fundamental fairness still requires that a defendant be given "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  As pled in her Amended Complaint, it is not altogether clear what substantive law Archibald's claims rest on.  To accord TCC fair notice, at the June 27, 2005

Final Pretrial Conference and hearing on the Motion for Summary Judgment, the Court required Archibald's attorney to state with specificity the sources of law on which her claims are based.

At the hearing, Archibald's counsel clarified that her claims are based on the racial discrimination and retaliation provisions of Title VII of the Civil Rights Act of 1964.[6]  See §§ 703(a) (race discrimination) and 704(a) (retaliation), 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a); see also Final Pretrial Order at 17 (Doc. No. 17) (winnowing the triable legal issues to race discrimination and retaliation).  Accordingly, Archibald's Amended Complaint pleads two causes of action.  First, she alleges that TCC's decision to offer her a 5% pay increase rather than the 10% increase she requested was based on race discrimination, in violation of § 703(a) of Title VII.  42 U.S.C. § 2000e-2(a).  (See EEO Grievance I (July 9, 2003); Pl.'s Am. Compl. ¶ 7.)  This claim rests on Archibald's belief that she was entitled to a 10% pay increase for assuming additional job responsibilities, but that Duncan and Milloy acted together to deny it to her on account of her race.

Second, Archibald alleges that TCC retaliated against her for filing an EEO grievance regarding the pay increase issue, in violation of § 704(a) of Title VII.  42 U.S.C. § 2000e-3(a).  (See EEO Grievance II (June 1, 2004); Pl.'s Am. Compl. ¶ 18.)  This claim rests on Archibald's belief that Duncan instructed her direct supervisor at the relevant time, Kunz, to retaliate against

---

[6]These claims are consistent with Archibald's prior EEO complaints.  On July 9, 2003, she filed an EEO grievance alleging race discrimination stemming from TCC's refusal to give her the 10% pay raise she requested.  (See EEO Grievance I (July 9, 2003).)  On June 1, 2004, she filed a second EEO grievance charging retaliation for filing the July 9, 2003 grievance.  (See EEO Grievance II (June 1, 2004).)  The EEOC dismissed both grievances and, as a matter of course, issued Archibald right to sue letters for both.  The July 9, 2003 and June 1, 2004 grievances demarcate the boundaries of the lawsuit.  See Bryant v. Bell Atlantic Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002) ("The EEOC charge defines the scope of the plaintiff's right to institute a civil suit.").

her for filing the July 9, 2003 grievance.  Archibald alleges that Kunz, at Duncan's behest,

retaliated against her by harassing her and subjecting her to micromanagement, creating a hostile

work environment.[7]

### C.     Procedural Background

Archibald instigated this lawsuit on August 16, 2004.  She had received a right to sue

letter from the EEOC concerning her July 9, 2003 race discrimination charge on May 26, 2004.

The right to sue letter concerning her June 1, 2004 retaliation charge was issued on July 28,

2004.  The original Complaint (Doc. No. 1) was never served on TCC.  Prior to the expiration of

the 120-day time limit for service, see Fed. R. Civ. P. 4(m), Archibald filed an Amended

Complaint (Doc. No. 2) on December 14, 2004.  The Amended Complaint was properly served

---

[7]One source of ambiguity in Archibald's Amended Complaint, which was compounded by the line of legal argumentation in her Memorandum in Opposition to Summary Judgment, is whether Archibald intended to bring a hostile work environment claim.  At the June 27, 2005 hearing, Archibald's attorney clarified that the Amended Complaint does not plead a cause of action for a hostile work environment.  In any event, even if Archibald had intended to bring such a claim, the Amended Complaint does not contain the requisite factual allegations to state a valid cause of action.  The Amended Complaint does not allege that Archibald ever filed, or attempted to file, an administrative grievance complaining of a hostile work environment.  The factual record presented to the Court confirm that no grievance was ever filed or was attempted to be filed, and Archibald's counsel conceded the fact at the June 27, 2005 hearing.  (See Dunn Aff. ¶ 5.)  Furthermore, in response to an impolitic e-mail he received on August 2, 2004 from Archibald accusing Kunz of not "lik[ing] African-Americans," TCC Vice-President for Administration Franklin T. Dunn sent Archibald a letter explaining the internal grievance procedures and their availability to her.  (Dunn Aff. ¶ 4; Dunn Letter to Archibald (Aug. 9, 2004).)  Dunn followed up the letter by meeting with Archibald on August 10, 2004, where he explained the grievance procedures to her.  (Dunn Aff. ¶ 4.)

As a consequence, Archibald is barred from piggybacking a hostile workplace claim onto her race discrimination and retaliation claims, for a plaintiff-employee is required to take reasonable steps to exhaust any available internal grievance procedures to redress the dispute as a prerequisite to bringing suit.  Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998); Brown v. Perry, 184 F.3d 388, 395 (4th Cir. 1999).  The failure of Archibald to do so is an affirmative defense to a hostile work environment claim for TCC.  Id.

on TCC, which filed its Answer (Doc. No. 3) on December 29, 2004.  The parties proceeded

pursuant to this Court's Rule 26(f) Pretrial Order (Doc. No. 4) and Rule 16(b) Scheduling Order

(Doc. No. 6), entered on January 4 and January 28, 2005, respectively.

     TCC filed this Motion for Summary Judgment (Doc. No. 12) on June 13, 2005, after

which time the parties submitted legal memoranda (Doc. Nos. 13, 14, 15) pursuant to the briefing

schedule established by Eastern District of Virginia Local Rule 7(F)(1).[8]  On Monday, June 27,

2005, this Court conducted the Final Pretrial Conference and entertained oral argument on the

Motion for Summary Judgment.  Upon completion of the hearing, the Court entered a Final

Pretrial Order (Doc. No. 17) and took the Motion for Summary Judgment under advisement.

Due to issues raised at the hearing, the Court invited the parties to submit a list of additional

caselaw supporting their respective positions.  Upon consideration of oral argument, re-reviewing

the parties' memoranda, examining supplemental caselaw provided by the parties, see infra note

16, and scrutinizing the depositions, affidavits, and other evidence attached to the memoranda,

the Court concluded that TCC is entitled to summary judgment on both of Archibald's claims.

The reasons for that conclusion follow.


## II.   LEGAL STANDARD

### A.    Summary Judgment

---

[8]Archibald's Memorandum in Opposition to Summary Judgment did not include a list of undisputed facts, which is required by Eastern District of Virginia Local Rule 56(B).  At the June 27, 2005 hearing, Archibald's counsel attempted to hand-up a revised memorandum comporting with the Rule.  However, TCC's counsel had no prior notice of the contents of the revised memorandum.  Consequently, upon TCC's objection, and in accordance with Local Rules 7(F)(1) and 56(B), this Court refused to accept or consider Archibald's untimely revised memorandum.

Summary judgment must be granted if the moving party demonstrates that "the pleadings, depositions [and] answers to interrogatories . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the movant so demonstrates, the burden of production, not persuasion, shifts to the non-moving party, Celotex at 477 U.S. at 322-23, who must "go beyond the pleadings and by [his] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(C)). Unquestionably, to avoid summary judgment, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Any facts left unresolved by the parties' submissions are considered in the light most favorable to the non-moving party. Id. at 587-88.

## B. Title VII Claims

In employment discrimination and retaliation suits brought under Title VII, a plaintiff-employee may, of course, base his claim on direct evidence. Additionally, or alternatively, a plaintiff-employee may base his claim on indirect evidence, thereby triggering the familiar allocation of burdens and order of presentation of proof established by the United States Supreme Court in McDonnell-Douglas v. Green, 411 U.S. 792 (1973). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); accord Karpel, 134 F.3d at 1227-28 (involving race discrimination and retaliation claims).

Under the McDonnell-Douglass framework, the plaintiff-employee shoulders the initial

14

burden of pleading a prima facie case of unlawful discrimination or retaliation by the defendant-employer.  A prima facie case creates a rebuttable presumption that any adverse action taken against the plaintiff-employee was unlawful and shifts the burden to the defendant-employer to articulate a legitimate, non-discriminatory and/or non-retaliatory justification for the adverse action.  This is a burden of production, not persuasion.  If the defendant-employer satisfies this production burden, the burden shifts back to the plaintiff-employee to identify evidence, for purposes of a motion for summary judgment, tending to show that the proffered justification is in fact a pretext for discrimination or retaliation.  In the final analysis, once a legitimate reason for the adverse action is adduced, the initial presumption is wiped away and the only question that remains is whether the defendant-employer actually discriminated or retaliated against the plaintiff-employee.  See St. Mary's, 509 U.S. at 506-12; Burdine, 450 U.S. at 253-56; accord Karpel, 134 F.3d at 1227-28.

When employing the McDonnell-Douglas framework to evaluate a Title VII claim based on indirect evidence, it is of critical importance to remain ever mindful that, "[a]lthough intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 143 (2000) (involving an age discrimination claim) (quoting Burdine, 450 U.S. at 253).  Thus, the ultimate burden of persuasion to prove that the defendant-employer acted with a discriminatory or retaliatory motive never shifts away from the plaintiff-employee.

## III.    ANALYSIS

A.      **Race Discrimination**

Section 703(a) of Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race. 42 U.S.C. § 2000e-2(a).  Archibald contends that she was denied a 10% pay increase for assuming additional job responsibilities on account of her race.  As is often the case in race discrimination cases, Archibald has not proffered any direct evidence indicating that she is the victim of discrimination.  Instead, her claim relies on indirect evidence, which requires the Court to resort to the McDonnell-Douglas framework to determine whether it has merit.

1.      **Prima Facie Case**

At a minimum, a prima facie claim of racial discrimination requires the plaintiff-employee to show the following: (1) that he is a member of a protected class, (2) that the defendant-employer took adverse employment action against him, and (3) that a sufficient causal nexus exists between his membership in a protected class and the adverse employment action. See Karpel, 134 F.3d at 1227.  The initial burden of pleading a prima facie case is "not onerous" and can be satisfied with relatively little evidence.  Burdine, 450 U.S. at 253.[9]  Archibald, who is black, is indisputably the member of a protected class.  Her case for race discrimination begins

_____

[9]The exact elements and standard of proof for a prima facie case for racial discrimination under Title VII are not inflexible, but rather vary from case to case as the particular factual circumstances warrant.  See McDonnell-Douglas, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification [] of the prima facie proof required from [the plaintiff-employee] is not necessarily applicable in every respect in differing factual situations."); accord Burdine, 450 U.S. at 253 n.6.  Since the United States Supreme Court has emphasized that the plaintiff-employee's initial burden is not onerous, see Burdine, 450 U.S. at 253, the elements of a prima facie case set forth here reflect the most favorable possible to Archibald.

and ends there, however, for she cannot meet the remaining requirements of a prima facie case: Archibald did not suffer an adverse employment action and there is no causal nexus between what she alleges to be an adverse employment action and her race.

**a)      Adverse Employment Action**

Under Title VII, a plaintiff-employee claiming race discrimination must show that he suffered an adverse employment action. Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). An adverse employment action is an act taken by the defendant-employer that negatively impacts the plaintiff-employee's "compensation, terms, conditions, or privileges of employment." Ali v. Alamo Rent-A-Car, Inc., 8 Fed. Appx. 156, 158, 2001 WL 218788 (4th Cir. Mar. 6, 2001) (quoting 42 U.S.C. § 2000e-2(a)(1)); see also infra note 15 (explaining the scope of adverse employment actions in the race discrimination and retaliation context). Archibald alleges that TCC's decision to offer her a 5% pay raise, rather than the 10% pay raise she requested, constitutes an adverse employment action. TCC counters that the compensation, terms, conditions, and privileges of Archibald's employment were not negatively impacted since she was in fact offered a 5% pay increase. Thus, at worst, TCC argues, Archibald received less than she hoped for.

Under some circumstances, the denial of a pay increase may constitute an adverse employment action. Flateau v. South Carolina Comm'n for the Blind, 50 Fed. Appx. 653, 654, 2002 WL 31553805 (4th Cir. Nov. 19, 2002), cited in Lovell v. BBNT Solutions, LLC, 295 F. Supp.2d 611, 626 n.12 (E.D. Va. 2003) (Ellis, J.). As TCC correctly points out, however, Archibald was not in fact denied a pay increase. To the contrary, she was actually offered a pay increase, which she ultimately declined. Archibald nonetheless contends that she suffered an

17

adverse employment action on the ground that she was entitled to a 10% pay increase.  So, she

argues, but for her race, she would have received a 10% pay increase.

Judge Ellis, of this judicial District, addressed an almost identical argument in the <u>Lovell</u>

case.  <u>See</u> 295 F. Supp.2d at 626 ("At its core, therefore, plaintiff's Title VII raise claim is that

she is not satisfied with her 2002 pay raise.  In other words, plaintiff concedes that in receiving

the pay raise she received a benefit, but she thinks she should have received an even greater

benefit.").  In <u>Lovell</u>, the plaintiff-employee received a 1.36% pay raise plus additional incentive-

based payments.  <u>Id.</u>  The plaintiff-employee attacked the pay increase as unlawful under Title

VII on the ground that it was lower than expected, even though the pay increase that she did

receive conferred some benefit on her.  <u>Id.</u>  Archibald makes the exact same argument: she

concedes that she was offered a 5% raise but believes that she should have been offered a 10%

raise.  Judge Ellis concluded that, "[a]bsent a very large disparity between the raise given a

claimant and the raises given to valid comparators, . . . 'it is difficult to see how a raise in one's

salary could constitute an *adverse* employment action.'"  <u>Id.</u> (quoting <u>Milligan v. Citibank</u>, 2001

WL 1135943, **4-5, 2001 U.S. Dist. LEXIS 16105, at *11-12 (S.D.N.Y. Sept. 26, 2001)

(emphasis in original)).[10]

Based on <u>Lovell</u>, to succeed in showing that the 5% pay increase she was offered

constitutes an adverse employment action because it was lower than expected, Archibald must

show by comparison that co-workers not within the protected class were given raises greater than

the raise she was offered.  In other words, Archibald must demonstrate that the position she

---

[10]As Judge Ellis pointed out, however, "[t]his is not to say . . . that receiving a lower raise
can *never* constitute an adverse employment action."  <u>Lovell</u>, 295 F. Supp.2d at 626 (emphasis in
original).

occupied was similar to that occupied by a higher-paid white employee or employees.  See Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994) ("The plaintiff may establish a prima facie case [of sex discrimination in compensation under Title VII] by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males."); cf. Wheatley v. Wicomico Co., Maryland, 390 F.3d 328, 332 (4th Cir. 2004) ("To make out a prima facie case under the [Equal Pay Act], the burden falls on the plaintiff to show that the skill, effort and responsibility required in her job performance are equal to those of a higher-paid male employee.").

Archibald has identified a single comparator: fellow HR Analyst Joan Harrell.  (See Def.'s First Set of Interrogatories, ¶ 6; see also Pl.'s Mem. in Opp. to Summ. J. at 2.)  Harrell, who is white, was promoted from a clerical position to HR Analyst in 2002, the same position that Archibald holds.  (Duncan Aff. ¶ 10.)  Therefore, it was conceded at oral argument by both parties that Archibald and Harrell's duties are substantially similar for purposes of comparing their salaries to probe for race discrimination.

For comparison sake, Archibald points to the fact that, while Harrell was given a 10% pay raise for being promoted to HR Analyst, she was offered only a 5% pay raise for assuming additional responsibilities as an HR Analyst.  The mere fact that a single white comparator was given a larger pay raise than a black counterpart does not, in and of itself, make Archibald the victim of an adverse employment action (and of race discrimination).  To prove an adverse employment action, Archibald must show that the circumstances surrounding Harrell's raise tends to indicate that Harrell was paid more because she is white, while Archibald was paid less because she was black.  Examining the circumstances surrounding Harrell's raise proves nothing

19

of the sort; to the contrary, the circumstances related to Harrell's pay increase belie the existence of any race discrimination.

Harrell received the 10% pay hike upon her promotion from a *clerical* job to the HR Analyst position; Archibald, on the other hand, simply assumed more responsibilities within the same HR Analyst position she already had. Additionally, Harrell is the lowest paid HR Analyst by more than $4,000 per year even *after* her 10% pay increase; conversely, Archibald, is the third highest paid HR Analyst out of five at TCC and would have earned over $7,000 per year more than Harrell had she accepted the 5% increase. See infra Appendix B. Archibald asks this Court to compare her pay increase to that of someone who completely changed positions and was paid a salary that was 20% *less* than hers. For purposes of proving that she suffered an adverse employment action, and for ultimately proving race discrimination, that serves as no useful comparison at all.

What is more, examining the salaries of all the HR Analysts reveals no apparent race discrimination based on pay at TCC. The highest paid HR Analyst, Brenda Boone, is black and, had Archibald accepted the 5% pay increase, she would have been paid more than two of the three remaining HR Analysts. The two HR Analysts paid less than Archibald are white. Moreover, Archibald has only ten years of state experience, while the HR Analysts she is paid more than, both of whom are white, have 23 and 11 years of state experience respectively. See infra Appendix B. Finally, had she accepted the pay increase, Archibald's salary would have been above the average salary for HR Analysts in Virginia. (See Milloy Confidential Memo. to Archibald (June 9, 2003).) In short, nothing about the pay distribution of the HR Analysts suggests that TCC's compensation scheme is motivated by unlawful consideration of race.

In a further attempt to raise an inference of racial discrimination, Archibald has submitted affidavits from current TCC employees, Doretha Monroe, Mary D. Parzynski, and Delzola Cuffee, and former employee Tawana Hardy, who allege that their salaries are or were lower than white co-workers.  However, the allegations are conclusory in nature and contain no specific information (such as dates, references to grievances, a list of job responsibilities, etc.) or data (such as pay scales or level of experience) from which the Court can extrapolate information about Archibald's situation.  For instance, Parzynski is not even employed in the HRO; Monroe's affidavit does not state what her position in the HRO is (based on the evidence in the record, she is not an HR Analyst, the position that Archibald holds); and Hardy, the former employee, worked in a different department at TCC and her affidavit does not state what her position was or contain any information about her job responsibilities.  (See Parzynski Aff; Monroe Aff.; Hardy Aff.)  Moreover, Cuffee, who is also not an HR Analyst, alleges in her affidavit that she was also denied a pay increase based on her race, though she does not state when and provides only a broad allegation supporting her belief: "I have seen in print and personally witnessed the depths (lies) management has conspired together to cover their unjust actions."[11]  (Cuffee Aff.)  None of the alleged "print" that Cuffee speaks of has been offered to the Court for review and there are no examples of the alleged "depths" to which TCC will go to discriminate.  Finally, in addition to the affidavits alleging pay discrimination, Archibald also submitted an affidavit from Wanda Joyner, a former TCC employee who claims that she was terminated on account of her race in

---

[11]It is worth noting that Cuffee filed a lawsuit against TCC almost identical to Archibald's at around the same time.  (In fact, Archibald's counsel also served as Cuffee's attorney.)  The result in that case is the same as the result here: TCC was granted summary judgment.  The opinion is pending.  See Cuffee v. Tidewater Community College, 2:04cv381 (E.D. Va. 2004) (Kelley, J.).

1997.  (See Joyner Aff.)  Joyner's affidavit does not identify any evidence supporting her

allegations, which involve events that took place more than five years prior to the events at issue

in this case.  Nothing in any of these affidavits lend credence to Archibald's belief that the

decision to offer her a 5% pay raise was motivated by race; sweeping allegations from co-

workers that they too have been the victims of racial discrimination, without some facts lending

credence to their claims, provides no support for Archibald's cause to avoid summary judgment.

Archibald did not suffer an adverse employment action.[12]

Archibald's argument that she suffered an adverse employment action boils down to this:

a 5% raise is less than she hoped for.  The fact remains, though, that receiving a 5% raise would

not have been detrimental in any respect: it would have amounted to a more than $1,700 raise

and resulted in an increase in her real income.  See Boone, 178 F.3d at 255-56 (holding that

reassignment without any decrease in compensation does not constitute an adverse employment

action); Lovell, 295 F. Supp. at 627 (holding that a raise differential of little magnitude cannot be

said to be an adverse employment action).  The fact is, "[e]very employment decision that

arguably has a negative impact on an individual does not rise to the level of an adverse

employment action."  Stringfield v. Christopher Newport Univ., 64 F. Supp.2d 593, 598 (E.D.

Va. 1999) (Friedman, J.).  In the abstract, every employee is negatively impacted by receiving a

smaller raiser than they desire.  However, that does not mean that the fundamental compensation,

terms, conditions, or privileges of employment have been adversely impacted as a matter of law.

To hold otherwise, as Judge Ellis emphasized in Lovell, "would allow employees disappointed

---

[12]The failures in these affidavits also undermine Archibald's attempt to show a causal
nexus and to prove that TCC's reasons for giving her a 5% pay increase are merely a pretext for
discrimination.  See infra Parts II.A.1.b and II.A.3.

over not receiving a higher raise to invoke Title VII to require courts to become involved in the

messy business of evaluating employees and making finely-tuned raise determinations."  295 F.

Supp.2d at 627.  This is a thicket into which this Court will not–and must not–wade.

### b)      Causal Nexus

_____As Archibald did not suffer an adverse employment action, she cannot state a prima facie

case of race discrimination under Title VII.  Even if Archibald did suffer an adverse employment

action, however, there is no evidence whatsoever that a causal nexus exists between being denied

a 10% pay increase and her race.  Rather than recite the lack of evidence of a causal nexus here,

in the exercise of prudence, the Court will run Archibald's claim through the remaining cogs of

the McDonnell-Douglas machinery.  See Karpel, 134 F.3d at 1229 ("Although [the plaintiff-

employee] present[ed] little or no direct evidence of a causal connection between her protected

activity [or, in this case, membership in a protected class,] and [the defendant-employer's]

adverse action, little is required.");  Gibson v. Old Town Trolley Tours of Washington, D.C., 160

F.3d 177, 181 (4th Cir. 1998) ("As the first step in a multi-stage proof scheme, the prima facie

case is not a difficult requirement to satisfy.");  Cleary v. Nationwide Mutual Ins. Co., 9 Fed.

Appx. 1, 7 n.6, 2001 WL 585102 *4 n.6 (4th Cir. May 31, 2001) (indicating that it is appropriate

to presume the existence of a prima facie case and resolve a Title VII claim by applying the

McDonnell-Douglas framework).  In any event, the evidence relevant to the alleged causal nexus

is also relevant to the remaining portions of the McDonnell-Douglas framework.  See, e.g., infra

note 14.  Out of an abundance of caution, the Court will therefore shift the burden to TCC to

articulate a legitimate, non-discriminatory reason for offering Archibald a 5% raise rather than a

10% raise.

_____        **2.        Legitimate, Non-discriminatory Justification**

TCC has no difficulty satisfying this (purely hypothetical) burden: there are ample

legitimate reasons for giving Archibald a 5% raise instead of a 10% raise.  As explained in the

recital of facts, see supra Part I.B.2, and as has already been shown, TCC articulated four reasons

for offering Johnson a 5% pay increase as opposed to the 10% increase she requested: (1) the

duties involved in Archibald's new position were not substantially different from her prior

duties; (2) a 10% increase would have resulted in Archibald having a higher than average salary

for HR Analysts in the State; (3) only 28% of pay increases at TCC are 10% or more and the

average in-band adjustment, the type of pay action Archibald sought, is 6.59%, which, in light of

the first two reasons, render a 5% increase appropriate; and, lastly (4) if Archibald received a

10% increase in salary when she was working for Johnson, her increased salary would have been

higher than boss's, Johnson.  (See Milloy Confidential Memo. to Archibald; Milloy Aff. ¶ 4; see

also Williamson Aff. ¶ 3; Williamson Memo. to Duncan; Duncan Aff. ¶ 9; Johnson Aff. ¶ 4.)  (A

list of the salaries, races, and years of experience of the HR Analysts is included in Appendix B.)

These are unquestionably legitimate, non-discriminatory reasons for giving Archibald a 5% as

opposed to a 10% raise.  Accordingly, the burden shifts back to Archibald to prove that these

reasons are merely a pretext for discrimination.

**3.        Pretext for Racial Discrimination**

The United States Court of Appeals for the Fourth Circuit applies a "pretext plus"

standard when evaluating a plaintiff-employee's attempt to avoid summary judgment.  Gillins v.

Berkeley Elec. Co-op., Inc., 148 F.3d 413, 416-17 (4th Cir. 1998).  This requires a plaintiff-

employee to make a two-pronged showing to survive a motion for summary judgment where the

defendant-employer articulates a legitimate rationale for the alleged adverse employment action: "[The plaintiff-employee] must adduce sufficient evidence both that the proffered, nondiscriminatory reason is false *and* that race discrimination is the 'real reason' for [the adverse employment action]." Id. at 417 (emphasis in original); see also Demuren v. Old Dominion Univ., 33 F. Supp.2d 469, 479 (E.D. Va. 1999) (Smith, J.) ("Under the pretext-plus standard, a plaintiff must do more than simply challenge the truthfulness of the defendant's explanation. Rather, he must offer some evidence that discrimination was the defendant's actual motivation.")

Archibald has not identified a single shred of evidence tending to show that the reasons articulated by TCC for offering her a 5% pay raise, rather than the 10% raise she requested, are false or that the actual motivation for the decision involved race. With respect to the truthfulness of TCC's reasons for offering her a 5% raise, Archibald acknowledged in her deposition that she had no evidence to refute the data that Milloy and her subordinates relied on to make the decision (that Archibald would be paid more than her supervisor; the state averages for pay increases; the salaries of other HR Analysts; and other information). (Archibald Depo. at 103-08, 116.) The only basis Archibald has for believing that a 5% increase is insufficient is a conversation she had with a fellow employee who claimed that 90% of all in-band pay increases are 10%. (Id. at 106-07.) There is absolutely no factual support for this conjecture; Archibald has not proffered any data refuting the distribution of in-band pay adjustments presented by Milloy. Moreover, TCC provided a summary of pay actions dating back to 2000, which includes the race and sex of the employees. (See TCC Pay Action Summary.) Perusal of the summary does not reveal any systemic discrimination against minorities. Other than the sweeping allegations she levels in her Amended Complaint, and the equally sweeping accusations lobbed by her supporters in the

affidavits attached to her Memorandum in Opposition to Summary Judgment, see supra note 12, Archibald cannot point to a single fact or trend tending to indicate that the reasons articulated for her 5% pay increase are false.

Even if Archibald could prove that TCC's justification is false, she also proffers no evidence of discriminatory motive. Archibald hangs her hat on the allegation that Williamson, who is white, and Johnson, who is black, wanted to give her the 10% increase she requested, but that Duncan, who is white, unilaterally decided to recommend a 5% increase to Milloy. In support of this theory, Archibald contends that Williamson promised her a 10% pay increase, that Johnson lied to her about the status of her request for the pay raise on multiple occasions, and, essentially, that this was smoke screen for a race-motivated decision by Duncan to recommend a 5% raise to Milloy. (See Archibald Aff. ¶ 1, 4-6; Archibald Depo. at 67-68; 89-93; Def.'s First Set of Interrogatories ¶ 5.) These allegations are squarely rebutted by TCC: Williamson denies ever promising Archibald a 10% raise; Johnson reports that she never lied to Archibald and in fact that she informed Archibald that she would only receive a 5% pay increase; and Duncan decided to recommend a 5% pay increase in consultation with Williamson and Johnson. (Williamson Aff. ¶¶ 3, 9; Johnson Aff. ¶ 6; Duncan Aff. ¶ 10.) Indeed, Williamson, Johnson, and Duncan all stated that they conferred together about Archibald's pay increase and collectively decided that 5% was an appropriate recommendation. (Williamson Aff. ¶ 3; Johnson Aff. ¶¶ 4-5; Duncan Aff. ¶ 10; see also Williamson Memo.)[13]  Moreover, Milloy ultimately made

---

[13]In her deposition, Archibald stated–with conviction–that she did not believe that Johnson, who is black, discriminated against her. (See Archibald Depo. at 89-91 ("I don't recognize black-on-race racism . . .").) That is inconsistent with Archibald's theory that she was lied to and given the run around on account of her race. If Johnson did not take any action based on Archibald's race, than Johnson's alleged participation in the decision to recommend only a

the decision to offer Archibald a 5% pay increase, which she based on Duncan's recommendation and her own independent judgment, based on the legitimate, non-discriminatory reasons outlined above. (Milloy Aff. ¶ 4.) Finally, Archibald's allegations are further belied by Milloy's offer to leave the ultimate decision on the appropriate amount of salary increase to TCC's powers that be in Richmond – an offer Archibald refused. (Id.; Archibald Depo. at 111-14.) Other than her own allegations, Archibald can muster no evidence that the decision to give her a 5% pay raise, rather than a 10% pay raise, had anything to do with her race.

However strongly Archibald may feel that she was discriminated against, only the perception of the individual taking the allegedly adverse employment action is relevant; the subjective belief of the party affected by the employment decision has no bearing on whether the action was actually discriminatory. Tinsley v. First Union Nat. Bank, 155 F.3d 435, 444 (4th Cir. 1998).[14] Archibald has not pointed to any evidence of discriminatory intent whatsoever. Likewise, she has not proffered any evidence tending to indicate that the reasons articulated by TCC for giving her a 5% raise instead of the 10% raise she requested are false. Archibald's

---

5% pay increase is ultimately irrelevant. Additionally, neither Johnson nor Williamson had the authority to give Archibald the 10% raise. (Duncan Aff. ¶ 9; Milloy Aff. ¶ 9.) Thus, even if they misled Archibald about the amount of the pay raise, that is not evidence of discrimination by the ultimate decisionmaker.

[14]Indeed, this only bolsters the conclusion in Part III.A.1 that Archibald failed to even state a prima facie case of race discrimination. As explained in that section, the third element of the prima facie case is a causal nexus between the allegedly adverse employment action and the plaintiff-employee's membership in a protected class. The only evidence of such a nexus in this case is Archibald's own allegations. The law is settled that a plaintiff-employee's "own naked opinion, without more, is not enough to establish a prima facie case of [race] discrimination." Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988). The only leg Archibald has to stand on is her own, which, quite simply, is insufficient to overcome summary judgment in the face of strong factual support in favor of TCC's position.

entire case rests on her own unsubstantiated allegations, which cannot form the basis of a cognizable Title VII race discrimination suit. See Old Town Trolley, 160 F.3d at 181 ("To find causation on the basis of bare-boned evidence asks the court to move beyond inference and into the realm of mere 'speculation and conjecture.' [citation omitted.]"). Accordingly, TCC is entitled to summary judgement on Archibald's claim for race discrimination in violation of Title VII.

### B.    Retaliation

Section 704(a) of Title VII makes it unlawful for "an employer to discriminate against any of his employees . . . because [the employee] has made a charge ... under this subchapter." 42 U.S.C. § 2000-3(a). Archibald contends that she was subjected to retaliatory harassment by her direct supervisor, HR Manager Kunz, at the direction of HR Director Duncan, for filing the July 9, 2003 EEO grievance of racial discrimination related to her consternation for being offered a 5% instead of a 10% pay increase. As with her claim of race discrimination, and as is commonly the case in Title VII retaliation claims, Archibald has no direct evidence that Kunz or Duncan intentionally retaliated against her. We therefore turn again to the McDonell-Douglas framework to evaluate the merits of her claim.

### 1.    Prima Facie Case

To establish a prima facie case of unlawful retaliation, a plaintiff-employee must demonstrate (1) that he was engaged in protected activity, (2) that the employer took adverse action against him, and (3) that there was a causal nexus between the protected activity and the adverse action. Karpel, 134 F.3d at 1228. It is undisputed that Archibald engaged in protected activity by filing her first EEO grievance, on July 9, 2003, alleging that she was the victim of

discrimination.  Thus, to satisfy the burden of a prima facie case, Archibald must show that she

suffered an adverse employment action and that there was a causal nexus between the adverse

action and her EEO grievance.  Archibald can prove neither.

### a)        Adverse Employment Action

In the context of a retaliation claim, "[a]dverse employment action includes any

retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on

the terms, conditions, or benefits of employment."  Von Gunten v. Maryland, 243 F.3d 858, 866

(4th Cir. 2001).[15]  Archibald contends that, beginning on January 6, 2004, her direct supervisor,

Kunz, subjected her to a hostile work environment constituting unlawful retaliation.

Specifically, she alleges that Kunz threatened her, harassed her about leave time and use of the

telephone, forced her to needlessly turn in her work to him for review on a daily basis, ordered

her to prepare onerous and unnecessary desk procedures, falsely accused her of withholding

information related to a co-worker's alleged abuse of alcohol, and hyper-monitored her absence

from her desk.  (See Pl.'s Am. Compl. ¶¶ 18-37; Archibald Aff. ¶¶ 15-19.)  She alleges that Kunz

subjected her to this treatment while not imposing such doggedness on her white counterparts.

---

[15]Some circuits have adopted the view that only an "ultimate employment decision" involving hiring, leave, discharge, promotion, or compensation actions can form the basis of a retaliation claim.  See Von Gunten, 243 F.3d at 863-64 (collecting and discussing cases).  This would render the scope of adverse employment actions more narrow in the retaliation context than in the discrimination context, which encompasses any action affecting the compensation, terms, conditions, or benefits of employment.  See id. at 863-66; see also supra Part III.A.1.a.  Though the distinction is razor thin, the United States Court of Appeals for the Fourth Circuit has reasoned that "conformity between the provisions of Title VII is to be preferred."  Ross v. Communications Satellite Corp., 759 F.2d 355, 366 (4th Cir. 1985), cited in Von Gunten, 243 F.3d at 865.  Therefore, the "ultimate employment decision" standard employed by some judicial circuits has been rejected by the Fourth Circuit in favor of a standard identical to that used in race discrimination cases under Title VII.  Id. at 865; see also Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997).

(See id.)  At bottom, Archibald argues that Kunz's micromanagement constitutes retaliatory

harassment.  Archibald further alleges that Kunz's conduct came at the behest of Duncan, who

was the subject of her July 9, 2003 EEO grievance complaining of race discrimination.[16]

(Archibald Depo. at 135.)  Finally, Archibald also alleges that Duncan fostered the development

of racial cliques in the workplace by holding "white-only" meetings every morning in her office,

behind closed doors, during April 2004.  (Pl.'s Am. Compl. ¶ 17; Archibald Aff. ¶ 12.)  All of

this, she claims, contributed to the intentional creation of a hostile workplace, which was

motivated by the filing of her July 9, 2003 EEO grievance.

"Retaliatory harassment can constitute adverse employment action, . . . but only if such

harassment adversely affects the 'terms, conditions, or benefits of [the plaintiff-employee's]

employment."  Von Gunten, 243 F.3d at 869-70 (citing Ross v. Communications Satellite Corp.,

759 F.2d 355, 363-64 (4th Cir. 1985); quoting Munday v. Waste Mgmt. of North America, Inc.,

126 F.3d 239, 243 (4th Cir. 1997)).  To constitute adverse employment action, the alleged

retaliatory harassment must be "'severe or pervasive enough' to create 'an environment that a

reasonable person would find hostile or abusive.'"  Id. at 870 (quoting Harris v. Forklift Sys., Inc.,

---

[16]This allegation was not leveled in Archibald's June 1, 2004 EEO grievance or the
Amended Complaint, but rather surfaced for the first time during her deposition.  (Archibald
Depo. at 135.)  (Archibald did lob a more general accusation in this vein in her affidavit (¶ 15)
alleging that "Human Resources have used John Kunz to retaliate against me in retaliation for
filing a discrimination claim.").  At the June 27, 2005 hearing on the Motion for Summary
Judgment, Archibald's attorney reiterated the allegation and explained that it lied at the core of
Archibald's theory of liability for retaliation.  However, the theory was not briefed in Archibald's
Memorandum in Opposition to Summary Judgment and took Defense counsel–and the Court–by
surprise.  To provide Archibald with every opportunity to point to some facts that might create a
material issue of fact, the Court accepted the argument and instructed counsel for both parties to
submit a list of relevant caselaw supporting their respective positions regarding conspiracies to
retaliate.  As explained, Archibald's factual allegations are unsupported and she musters no legal
theory to avoid summary judgment.

510 U.S. 17, 21 (1993)).  This requires a two-pronged showing by the plaintiff-employee: that

the conduct was both subjectively and objectively hostile.  Id.  The Court need not even delve

into Archibald's subjective beliefs concerning Kunz's and Duncan's treatment of her, for there is

no objective evidence from which a factfinder could conclude that the environment was

unreasonably abusive or hostile.

Monitoring Archibald's phone calls and absences from her desk to reduce "time theft,"

requesting that she submit her work for review, and examining her leave requests may be

annoying, but they are within the legitimate purview of an employer.  Particularly with regard to

monitoring productivity, which is at the heart of Archibald's complaint, the activities in which

Kunz engaged "merely involved the imposition of generally applicable departmental policies"

initiated by Duncan for the entire HRO.  Von Gunten, 243 F.3d at 870.  Indeed, the entire HRO

at TCC was subjected to elevated scrutiny of their phone calls and general time management

skills due to concerns over productivity by management.  (Duncan Aff ¶ 15; Kunz Aff. ¶ 4.)

Taking steps to eliminate time theft and increase productivity simply does not offend standards of

reasonableness in the workplace.

Archibald contends that she was subjected to especially strict scrutiny of her activities.

(Am. Compl. ¶ 30; Archibald Aff. ¶ 35.)  That Archibald may have been subjected to more

scrutiny than some of her co-workers does not rise to the level of an adverse employment action.

Rather, it only reflects the fact that Archibald was among the most egregious abusers of work

time.  See discussion on Archibald's abuse of work time supra Part I.B.3 and infra III.B.3.

Additionally, at least with respect to the monitoring of phone calls and other wasted time,

Archibald was the only employee that Kunz supervised during the time period in question, so the

fact that he did not monitor other employees the way he monitored Archibald only means that he remained within his assigned responsibilities.[17]  (Kunz. Aff. ¶ 5.)

Archibald next argues that Kunz harassed her by following up on two instances where she disappeared from her work station for prolonged periods without informing Kunz in advance, on July 28 and July 29, 2004.  See infra note 24.  Archibald has proffered an excuse for her absence from her workstation related to an alleged medical condition.  See id.  That excuse is neither here nor there.  The fact is, Archibald was away from her desk for upwards of 30 minutes and Kunz was unaware why.  His following up on the issue does not constitute harassment, but rather is an example of competent management.  Moreover, the fact that Kunz ultimately issued Archibald a memorandum and letter of reprimand outlining his concerns with her absences and with her continued excessive personal phone use, and further warning her to improve her productivity, does not constitute an adverse employment action.  Neither the memorandum nor the letter of reprimand were placed in her file, and Archibald does not even allege that either communication adversely impacted the compensation, terms, conditions, or benefits of her employment.[18]  See

---

[17]In support of her allegations, Archibald submitted affidavits from one current and one former TCC employee who, when meeting with Archibald on different occassions, claim to have been looked at menacingly and badgered by Kunz and Duncan.  (See Ballard Aff. and McBride Aff.)  As with the accusations contained in the affidavits relevant to Archibald's discrimination claim, see supra Part III.A.1.a, the claims contained in these affidavits are conclusory and unsubstantiated.  Archibald herself does not even make reference to her meetings with Ballard and McBride and the way they felt during their alleged encounters with Kunz and Duncan in her own affidavit.  Even if true, these isolated events lend no support to Archibald's claim that she was subject to ongoing retaliatory harassment.

[18]In her affidavit, Archibald contends that information contained in the memorandum and letter of reprimand prove that she was under retaliatory surveillance, alleging that, "[a]t this point I knew that Management had put me under surveillance by all five (5) managers."  (Archibald Aff. ¶ 26.)  This allegation is outlandish; it is not supported by any facts in the record.  In any event, surveillance of an employee does not constitute an adverse employment action.  See

Nye v. Roberts, 159 F. Supp.2d 207, 213 (D. Md. 2001) ("Reprimands do not automatically affect the terms and conditions of employment."). Indeed, Kunz's and Duncan's latest performance evaluation of Archibald marks her as a "Contributor."[19] (Performance Eval. (Nov. 9, 2004).)[20]

Finally, Archibald claims that Duncan fostered the development of racial cliques in the workplace by having "white-only" meetings every morning in her office, behind closed doors, during April 2004. (Pl.'s Am. Compl. ¶ 17; Archibald Aff. ¶ 12.) She argues that the alleged exclusive nature of these meetings constituted an adverse employment action. For starters, and once again, other than her own allegations, Archibald has not provided any evidence substantiating her claim that Duncan encouraged the development of racial cliques and that she excluded black employees from informal meetings during the morning time. Duncan, Kunz, Johnson, and Williamson all declare that the allegation is untrue in their affidavits. (Duncan Aff.

---

Munday, 126 F.3d at 243 ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in protected activity, without evidence that the terms, conditions, or benefits of her employment were adversely affected.")

[19]TCC's performance evaluation form permits the reviewer to rate the employee three possible ways: "Extraordinary Contributor," "Contributor," or "Below Contributor."

[20] Archibald also claims that Kunz harassed her for refusing to divulge information about a co-worker that she had alleged was intoxicated at work. (Archibald Aff. ¶ 19(b).) However, Archibald appears to have raised the issue herself by informing another supervisor earlier in the day that the employee in question was "drunk." (Kunz Aff. ¶ 11.) When Kunz was relayed the information by the other supervisor, he followed up on the matter with Archibald, who refused to discuss it. (Id.) Even if Kunz was gruff in his approach to addressing the issue, his persistence does not constitute retaliatory harassment. If anything, Kunz's following up on an allegation that an employee is intoxicated at work demonstrates competent management.

¶ 18; Kunz Aff. ¶ 9; Johnson Aff. ¶ 9;[21] Williamson Aff. ¶ 12.)  Furthermore, even if Duncan

held meetings in her office and Archibald perceived them to be "white-only," Archibald's own

deposition testimony indicates that they were not so exclusive so as to interrupt work.  According

to Archibald, if she ever needed to speak with Duncan or obtain something from her, she could

interrupt these informal meetings to address those needs.  (Archibald Depo. at 129.)

Consequently, none of the compensation, terms, conditions, or benefits of Archibald's

employment were adversely impacted by Duncan's conducting of informal meetings in her office

during the morning hours.  Of course, it is possible that Archibald felt uncomfortable

participating in informal office chat with Duncan, Kunz, and others because of her pending EEO

grievances.  However, to the extent that her relationship with Duncan, Kunz, and any other

employees may have been–or continue to be–icy due to her EEO grievances, that discomfiture

amounts to "non-actionable office unpleasantries that were at most the result of predictable

tension in the workplace following the lodging of discrimination and retaliation charges."  Von

Gunten, 243 F.3d at 870 (internal quotation omitted).

A reasonable person, considering TCC's need to improve worker productivity, and

knowing Archibald's proclivity for spending excessive time on the phone for personal reasons,

see supra Part I.B.2 and infra Part III.B.2, could not conclude that the monitoring she was

subjected to, or that the prevailing conditions in the office, were unreasonably abusive or hostile.

More likely than not, under the circumstances, a reasonable person would conclude that the steps

taken by Duncan and Kunz were justified–even necessary–for the effective management of the

---

[21]According to Johnson, "I have never seen Ms. Duncan segregate her staff along racial lines.  As a black female, I have always felt welcome in Ms Duncan [sic] office."  (Johnson Aff. ¶ 9.)

TCC HR department.  Micromanagement is bothersome and frustrating.  It may even be ineffective at achieving its aims.  But, in and of itself, it does not constitute harassment.  See Von Gunten, 243 F.3d at 870; Munday, 126 F.3d at 243; Cleary, 9 Fed. Appx. at 10, 2001 WL 585102 at * 7-8 (holding that close monitoring of an employee by a supervisor is not retaliatory in nature absent evidence that it is extraordinary or is pretextual).

### b)      Causal Nexus

Even if all of Archibald's complaints were substantiated, there is no causal nexus between the action taken and Archibald's July 9, 2003 EEO grievance.  In support of her claim that a causal nexus exists between Kunz's and Duncan's treatment of her and her engagement in protected activity is the "short time" between the beginning of the alleged retaliatory harassment and the filing of her EEO grievance.  (Pl.'s Am. Compl. ¶ 38.)  Temporal proximity between protected activity and adverse employment action is generally sufficient to satisfy the prima facie burden of showing a causal nexus.  King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003).  In this case, the time element involved precludes finding a prima facie showing of causation.

Duncan first learned of Archibald's EEO grievance in July or August 2003.  (Duncan Aff. ¶ 13.)  There is no evidence concerning when or if Kunz ever became aware of the EEO complaint, see further discussion infra, and there is at least a five-month lag between the time that Duncan became aware of the EEO grievance and when the allegedly retaliatory conduct began, which was on January 6, 2003.  (Compare Duncan Aff. ¶ 13 with Pl.'s Am. Compl. ¶ 18.) In King, the plaintiff-employee established a prima facie case of retaliation based on a two-and-a-half-month time period between the filing of an EEO grievance and her termination.  King, 328 F.3d at 151.  The Fourth Circuit concluded that "[t]his length of time between [the defendant-

employer]'s notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events." Id. at 151 n.5.  If a two-and-a-half month period between a defendant-employer's notice of the plaintiff-employee's protected activity and the allegedly adverse employment action "weakens significantly" an inference of causation, then a five-month period, absent something more, prohibits such an inference.  See also Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) ("[G]enerally the passage of time . . . tends to negate the inference of discrimination."); Lettieri v. Equant, Inc., 367 F. Supp.2d 958, 966 (E.D. Va. 2005) (Cacheris, J.) (indicating that a seven-month time difference between notice of the protected activity and an adverse employment action is too great a period of time from which to infer a causal nexus).

Moreover, Archibald has not provided any evidence that Kunz was actually aware of her July 9, 2003 EEO grievance.  In her deposition, Archibald refers to a meeting between she and Kunz where he indicated that he was aware that there were some "legal issues in nature." (Archibald Depo. at 134.)  Archibald claims to have cut-off Kunz because she did not want to discuss the matter.  (Id.)  As a result, it is unclear exactly what legal issues Kunz was referring to. Additionally, no one else was present at the meeting, Archibald cannot even recall when it took place (see id.) and Kunz's affidavit does not contain any information about the alleged confrontation.  Something is remiss.

In his affidavit, Kunz reports learning, on or about May 19, 2004, that Archibald contacted the Virginia EEO office to complain that he was harassing her.  (Kunz Aff. ¶ 7.)  He spoke to an EEO investigator about Archibald's complaint on May 27, 2004.  (Id.)  Thus, depending on when the alleged meeting between Archibald and Kunz took place, Kunz may have

been referring to the May 19, 2004 complaint.  However, if that is the case, the alleged

Archibald-Kunz meeting is immaterial to this lawsuit.  Archibald's May 19, 2004 complaint of

harassment is not the subject of this lawsuit; that allegation is separate and apart from the July 9,

2003 EEO grievance that is the subject of the retaliation claim in this lawsuit.  Kunz was not

even employed by TCC at the time Archibald filed the July 9, 2003 EEO grievance in question.

(Kunz Aff. ¶ 1.)  Consequently, the only way for him to have become aware of the July 9, 2003

EEO grievance is for him to have been told.  Nowhere in the factual record before the Court is

there evidence that he was informed of the July 9, 2003 EEO grievance prior to the instigation of

this lawsuit.  If a defendant-employer is unaware of the plaintiff-employee's EEO's activity, as a

matter of fact *and* law, no causal nexus exists.  Old Town Trolley, 160 F.3d at 182; see also

Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)

("[T]he employer's knowledge that the plaintiff engaged in protected activity is absolutely

necessary to establish the . . . prima facie case.").[22]

---

[22]It must be said that Kunz neither explicitly admits nor denies knowing about the July 9,
2003 EEO grievance.  The only reference to the July 9, 2003 EEO grievance in Kunz's affidavit
comes in the last paragraph, where he attests that "I have not harassed her, nor have I treated her
differently because she chose to go to the EEOC in the Summer of 2003."  (Kunz. Aff. ¶ 14.)
However, unlike his specific acknowledgment in his affidavit that he was aware of the May 19,
2004 harassment complaint that Archibald made (see ¶ 7), nowhere does Kunz state that he was
aware of the July 9, 2003 EEO grievance during the time period relevant to the alleged retaliatory
harassment.  This permits a reasonable inference that he in fact did *not* know about the grievance
until this litigation began.  As the Court is bound to view unsettled facts in the light most
favorable to the non-movant on a motion for summary judgment, the Court hereafter assumes
that Kunz was aware of the grievance for the sake of argument.  However, due to the volume of
unsubstantiated allegations leveled by Archibald, it is necessary to point out that there is actually
no direct evidence that Kunz even knew that Archibald had filed an EEO grievance during the
period for which she alleges retaliatory harassment.  Moreover, since knowledge is an "absolute"
requirement to establish causation, the fact that there are shades of doubt over what Kunz knew
and when he knew it is of substantial import.

Even if Kunz was aware of Archibald's prior EEO activity, which the Court may assume for purposes of argument, see supra note 22, there is no evidence, save Archibald's own naked allegations, that Kunz was actually motivated to retaliate against Archibald for engaging in it. The affidavits attached to Archibald's Memorandum in Opposition to Summary Judgment related to the retaliation claim relay observations of Kunz's conduct and their impact on Archibald.  See supra note 17.  However, Archibald has not put forth any witness who can testify to Kunz's knowledge of her EEO activity or his motivation for it.  According to Kunz and Duncan, the motivation for micromanaging Archibald was to prevent time theft in the form of excessive personal phone use, prolonged absences from her work station, and other time wasting activities.  (Kunz Aff. ¶¶ 4-6, 8; Duncan Aff. ¶ 15.)  "Knowledge is necessary to establish causation, but it is not sufficient [by itself]."  Old Town Trolley, 160 F.3d at 182; see also Peterson v. West, 17 Fed. Appx. 199, 202, (4th Cir. Sept. 5, 2001) ("The mere fact that [the defendant-employer] knew that [the plaintiff-employee] was testifying in another employee's EEO matter is insufficient evidence of retaliation.").  Even if Kunz did have knowledge of Archibald's July 9, 2003 EEO grievance, there is no additional evidence that he was motivated to retaliate against her as a result of it.

Likewise, and most critical of all, there is no evidence supporting Archibald's claim that Duncan directed Kunz to retaliate against her for filing the July 9, 2003 grievance.  Archibald's belief that Duncan instructed Kunz to retaliate against her is based on the following conjecture, which Archibald set forth at her deposition:

> ATTORNEY:          Who do you think you were talking about in your complaint when
>                    you said that HR was using John Kunz to retaliate against you?

ARCHIBALD:      Who do I think put John Kunz up to retaliate against me?

ATTORNEY:       Yes.

ARCHIBALD:      Ms. Duncan

ATTORNEY:       Tell me the facts that would support that accusation.

ARCHIBALD:      Well, it just – it was just strange because every time he would come out of a meeting with her, he would come over to me with negative – just a negative vibe.  And I need this, and you need to do that, and Nancy Duncan said that your job wasn't a full-time position and things like that.
       And I was like – and one day I told him, I said, you know what, this is – every time I meet with you, this is always an issue.  But I said I know who put you up to this.  And he said who?  And I said Ms. Duncan.  At first he said no, and then he said, well, yeah.  First he said no, and we kept on talking, and he said, well, yeah.

ATTORNEY:       Why do you think that Ms. Duncan --

ARCHIBALD:      Because I filed EEO charges.

(Archibald Depo. at 135-36; <u>see also</u> <u>id.</u> at 136-37.)  It is true that Duncan had something to do with Kunz's close monitoring of Archibald's conduct: Duncan instructed *all* of the HR managers to take steps to improve worker productivity and efficiency by limiting time theft.  (Duncan Aff. ¶ 15; Kunz Aff. ¶¶ 4-5; Johnson Aff. ¶ 8.)  Kunz's monitoring Archibald was indeed at the behest of Duncan, but the purpose was to limit time theft, not to retaliate for an EEO charge.  In any event, absent other evidence, Kunz's statements to Archibald are not evidence of retaliation at all, for "[s]tatements by subordinates[, such as Kunz,] normally are not probative of an intent to retaliate by the decisionmaker[, Duncan]."  <u>Willis v. Marion Co. Auditor's Office</u>, 118 F.3d 542, 546 (7th Cir. 1997).

Once again, there is no evidence supporting Archibald's allegations.  The affidavits

submitted by Archibald that are relevant to the retaliation claim contain no evidence, or even allegations for that matter, that Duncan directed Kunz to retaliate against her.  Additionally, based on Duncan's prior approach to EEO grievances, it appears that she embraced the EEO process and looked favorably upon its appropriate use.  Archibald acknowledged in her deposition that, in 1998, when she was having problems with a supervisor, she approached Duncan for help.  (Archibald Depo. at 43.)  To aid Archibald, Duncan encouraged her to file an internal grievance, sent the employees involved to a seminar on supervisory skills, and even moved the supervisor to a different area in the office.  (Id. at 43, 47; Duncan Aff. ¶ 4; see also supra Part I.B.1.)  Duncan's conduct in 1998, attested to by Archibald, is not indicative of a person who would instruct one subordinate to retaliate against another.  The only leg that Archibald's retaliation claim has to stand on is her unsubstantiated subjective belief that Duncan acted differently this time because the July 9, 2003 EEO grievance she filed involved Duncan herself.  (See Archibald Depo. at 136.)  Conclusory allegations such as that are insufficient to establish a causal nexus.

Although Archibald has presented no evidence that she suffered an adverse employment action, or that there is a causal nexus between the way she was treated at work and the July 9, 2003 EEO charge, as explained in Part III.A.1.b, little evidence is required to make out a prima facie case.  Thus, though this Court has concluded that Archibald failed to plead a prima facie case of retaliation, out of an abundance of caution, the Court will shift the burden to TCC to articulate a legitimate, non-retaliatory justification for Kunz's close monitoring of Archibald's work conduct.

### 2.      Legitimate, Non-Retaliatory Justification

TCC easily satisfies its (purely hypothetical) burden of stating a legitimate, non-retaliatory justification for its close monitoring of Archibald's work conduct.  Late in the Summer of 2003, the HR Managers reported to Duncan that staff members' work productivity was suffering due to distractions such as spending excessive amounts of time on the telephone, taking extended absences from their work stations, abusing sick leave, and arriving late and leaving early from work.  Duncan's examination of the HRO phone logs between January and April 2004 confirmed that personal phone usage was a particular problem.  As a consequence, on April 23, 2004, Duncan called a meeting of all staff members in the HR department to address productivity and time theft.  She urged the staff to "work smarter, not harder."  She also instructed each of the office managers to meet with individual HR staff whose phone usage was excessive.  Duncan informed the HR staff that this would take place.  See supra Part I.B.3.  (See Duncan Aff. ¶ 15; Kunz Aff. ¶ 4; Johnson Aff. ¶ 8; Duncan Talking Points (Apr. 23, 2004); Archibald Depo. at 137-38.)

Reviewing the phone logs revealed that Archibald used the phone for personal use during work hours on an excessive basis.  Between January 27 and March 25, 2004, Archibald logged ten days with over 20 personal calls per day, 20 days with over 45 minutes of personal call time, and 18 days with at least two calls over ten minutes in duration.  (Kunz Aff. ¶ 5; Phone Logs.) Though Archibald may not have admitted to making all of these calls initially (see Kunz Aff. ¶ 5; Kunz Memo. for the Record I (April 23, 2004)), in her deposition she concedes that she spent a significant amount of time on the phone during the workday.  (Archibald Depo. at 137-44.)  See also supra Part I.B.3.

In short, TCC's justifications for monitoring Archibald closely was the HRO's low work

productivity and Archibald's own egregious time theft.  Without question, these are legitimate, non-retaliatory reasons that affirmatively shift the burden to Archibald to prove that they are merely a pretext for retaliation.[23]

### 3.     Pretext for Retaliation

The pretext plus standard for rebutting the defendant-employer's non-retaliatory justification is the same in retaliation cases as in employment discrimination cases.  See Gillins, 148 F.3d at n.1; see also supra Part III.A.3.  Thus, to avoid summary judgment, Archibald must point to evidence tending to show that TCC's concerns with work productivity were false and that the real reason she was closely monitored was to retaliate against her.  She fails on both counts.

First, Archibald adduces absolutely no evidence whatsoever that TCC was not genuinely concerned with worker productivity in the HRO.  The fact that Duncan had a full staff meeting to address the problem on April 23, 2004, coupled with the above-described conduct of Archibald with respect to her personal phone use, demonstrates that time theft was a real problem in TCC's

---

[23]Wasted time at work is not a problem to be taken lightly, especially for cash-strapped public agencies.  A recent survey conducted by America Online and Salary.com indicates that the average worker wastes about 2.09 hours per eight-hour workday, not including scheduled breaks. Wasted time includes such activities as internet surfing, talking on the phone, conversing with co-workers, addressing personal issues, daydreaming, etc.  According to the survey, this is about twice as much wasted work time as most employers account for in budgeting salaries, resulting in as much as $759 billion per year in wasted salary expenses.  The problem of wasted time at work, generally referred to as "time theft," is paramount in Virginia: the survey identifies Virginia as the seventh most wasteful state in the country, averaging 2.7 hours per day of wasted time, or more than 20% above the national average.  This costs Virginia employers approximately $29 billion each year.  See "Wasted Time at Work Costing Companies Billions, available at <http://www.salary.com/careers/layoutscripts/crel_display.asp?tab=cre&cat=nocat&ser=Ser374&part=Par555> (last viewed on July 13, 2005).  These data further legitimize TCC's justification for closely monitoring–even micromanaging–HR staff, and Archibald in particular, in their work habits.

HR department.  See also supra note 23.

Second, Archibald points to no evidence indicating that Kunz's motive for approaching her about productivity, and then monitoring her closely, had anything to do with her filing of the July 9, 2003 EEO grievance.  As explained above, Archibald used the phone for personal calls on an excessive basis.  Assuming that Archibald's allegation that she was scrutinized more closely than other employees is true, the evidence indicates that it was because she was among the most egregious abusers of work time and continued to make personal calls even after being admonished not to (See Kunz Memo. to Archibald (Aug. 2, 2004); Letter of Reprimand (Aug. 6, 2004).)  Additionally, she was later seen missing from her desk for extended periods of time on July 28 and July 29, 2004.[24]  Kunz had ample reason to micromanage Archibald and to take steps to correct her conduct.

Likewise, there is no evidence that Archibald was singled out.  According to Duncan, all of the HR Managers addressed time theft and personal phone usage with their subordinates. (Duncan Aff. ¶ 15.)  Indeed, Johnson, who is also an HR Manager, in accordance with Duncan's instructions, confirms that she addressed personal phone use and time theft issues with Brenda Boone, the HR Analyst she supervises.  (Johnson Aff. ¶ 8.)  Even Archibald admits that other HR Managers addressed productivity issues with their subordinates in accordance with Duncan's

---

[24]Archibald claims that these absences were for medical reasons.  Archibald Depo. at 147-51.  Kunz claims he was unaware that Archibald suffered from any medical problems at the time. (Kunz Aff. ¶ 13.)  Resolving this discrepancy is not necessary.  Regardless of the reason, the mere fact that Kunz was aware of Archibald's excessive phone usage and her prolonged absences from her desk warrant his close monitoring and decision to write a memorandum and letter of reprimand to her in an attempt to correct the problem.  As explained in Part III.B.1.a, neither communication was placed in her file or adversely impacted the compensation, terms, conditions, or benefits of her employment.

directives and the expectations she set forth at the April 23, 2004 all staff meeting. (Archibald Depo. at 138.)

There is simply no evidence whatsoever that Archibald was retaliated against. Accordingly, even taking all of Archibald's allegations as true for the sake of argument, TCC is entitled to summary judgment on Archibald's claim for unlawful retaliation.

## IV.     CONCLUSION AND ORDER

When all is said and done, there is absolutely no evidence that Archibald was the victim of race discrimination or retaliation, which occassions pause to consider what precipitated this lawsuit. Perhaps it was envy by Archibald that Johnson was promoted to the position of HR Manager? Or, perhaps it was a breakdown in communication between Archibald and her supervisors? Perhaps it is related to Archibald's alleged medical condition? Still yet, perhaps it is sheer anger, disgruntlement, or a breach of trust? We will never be certain. What is certain, however, is that none of those reasons are actionable under Title VII; all of Gwendolyn Archibald's claims against Tidewater Community College lack substantive merit. Accordingly, the Motion for Summary Judgment is **GRANTED** and it is **ORDERED** that judgment be entered in favor of the Defendant.

The Clerk of the Court is **DIRECTED** close this case and to forward copies of this Memorandum Opinion and Order to counsel of record for both parties.

**IT IS SO ORDERED.**

_____/s/_____
UNITED STATES DISTRICT JUDGE

July 15, 2005

Norfolk, Virginia

**APPENDIX A:**
***Documents Submitted by Parties Cited in Opinion***

**Defendant's Motion for Summary Judgment (Doc. No. 13)**

*Enclosure I*

* Deposition of Gwendolyn Archibald, May 3, 2005 ("Archibald Depo.")

* Memorandum from Norman L. Carter to Gwendolyn Archibald, October 31, 1997 ("Carter Memo. to Archibald")

* Letter from Anna H. Turnbull, Norfolk State University Payroll Manager, to Gwendolyn Archibald, October 23, 1997 ("Turnbull Letter to Archibald")

* Gwendolyn Archibald's Letter of Resignation from Norfolk State University, December 17, 1997, Exh. 3 ("Archibald Resignation Letter")

* Norfolk State University Disciplinary Notices, March 25 and October 24, 1997, Exh. 3 ("NSU Disciplinary Notices")

* Norfolk State University Performance Evaluation, October 24, 1997, Exh. 4 ("NSU Performance Evaluation")

* Application for Employment at TCC and Professional Resume of Gwendolyn Archibald, Nov. 7, 1997, Exh. 5 ("Archibald Employment App. & Resume")

* Memorandum by TCC President Deborah M. DiCroce Concerning the Archibald/Kuebler Grievance, October 21, 1998 ("DiCroce Memo.")

* Internal Grievance by Gwendolyn Archibald, September 9, 1998, Exh. 6 ("Archibald Internal Grievance")

* Response to Grievance Filed by Gwen Archibald by TCC Vice-President for Finance Phyllis Milloy, September 28, 1998, Exh. 6 ("Milloy Grievance Response")

* Confidential Memorandum from Phyllis Milloy to Gwen Archibald, June 9, 2003, Exh. 12 ("Milloy Confidential Memo. to Archibald")

* TCC Summary of Pay Actions Since Comp Reform Implementation, Exh. 12 ("TCC Pay Actions")

* Archibald EEO Race Discrimination Grievance, July 9, 2003, Exh. 23 ("EEO

Grievance I").

* Archibald Right to Sue Letter for Race Discrimination, May 17, 2004, Exh. 23

* Archibald EEO Retaliation Grievance, June 1, 2004, Exh. 23 ("EEO Grievance II")

* Archibald Notice of Suit Rights, July 28, 2004, Exh. 23

*Enclosure II*

* Affidavit of Phyllis F. Milloy, TCC Vice-President for Finance, June 8, 2005 ("Milloy Aff.")

* Memorandum from Phyllis Milloy to Nancy Duncan, May 28, 2003, Exh. B ("Milloy Memo. to Duncan")

*Enclosure III*

* Affidavit of Nancy Duncan, TCC Director of Human Resources, June 8, 2005, ("Duncan Aff.")

* Summary of Pay Actions Since Comp Reform Implementation, Exh. D ("TCC Pay Actions")

* Memorandum from Kathy Williamson to Nancy Duncan, May 27, 2003, Exh. F ("Williamson Memo. to Duncan").

* Talking Points for OHR Staff Meeting Held on April 23, 2004, Exh. J ("Duncan TalkingPoints")

*Office of Equal Employment Services, Virginia, Opinion Denying Archibald's July 9, 2003 EEO Grievance, June 22, 2004, Exh. K ("EEO Opinion")

*Enclosure IV*

* Affidavit of Kathleen C. Williamson, TCC Compensation and Classification Manager, June 7, 2005 ("Williamson Aff.")

*Enclosure V*

* Affidavit of John J. Kunz, TCC Compensation and Classification Manager, June 8, 2005 ("Kunz Aff.")

* Phone Logs of Gwendolyn Archibald, January 27 to March 25, 2004, Exh. B ("Phone Logs")

* Memo for the Record by John Kunz, April 23, 2004, Exh. C ("Kunz Memo. for the Record I")

* Memo for the Record by John Kunz, May 6, 2004, Exh. D ("Kunz Memo for the Record II")

* Memorandum from John Kunz to Gwen Archibald, August 2, 2004 ("Kunz Memo. to Archibald")

* Letter of Reprimand from John Kunz to Gwen Archibald, August 6, 2004 ("Letter of Reprimand")

*Enclosure VI*

* Affidavit of Brenda M. Johnson, Benefits Manager, June 8, 2005 ("Johnson Aff.")

*Enclosure VII*

* Defendant's First Set of Interrogatories and Request for Production of Documents, May 1, 2005 ("Def.'s First Set of Interrogatories")


**Defendant's Rebuttal Memorandum in Support of Summary Judgment (Doc. No. 15)**

*Enclosure VIII*

* Affidavit of Franklin T. Dunn, TCC Vice-President for Administration, June 24, 2005 ("Dunn Aff.")

* Letter from Franklin Dunn to Gwendolyn Archibald, August 9, 2004, Exh. B ("Dunn Letter")


**Plaintiff's Memorandum in Opposition to Summary Judgment (Doc. No. 14)**

* Affidavit of Gwendolyn Archibald, June 22, 2005 ("Archibald Aff.")

* Affidavit of Terry Ballard, June 22, 2005 ("Ballard Aff.")

* Affidavit of Doretha Monroe, June 22, 2005 ("Monroe Aff.")

* Affidavit of Tawana Hardy, June 22, 2005 ("Hardy Aff.")

* Affidavit of Mary D. Parzynski, June 22, 2005 ("Parzynski Aff.")

* Affidavit of Robert A. McBride, June 22, 2005 ("McBride Aff.")

* Affidavit of Delzola Cuffee, June 22, 2005 ("Cuffee Aff.")

* Affidavit of Wanda Joyner, June 22, 2005 ("Joyner Aff.")

**APPENDIX B:**
*TCC Human Resources Staff Hierarchy (Personnel Relevant to this Lawsuit; Race Noted)*

<u>**Vice-Presidents**</u>

Franklin Dunn (white)
(for Administration)

Phyllis Milloy (white)
(for Finance)

<u>**Director of Human Resources ("HR Director")**</u>

Nancy Duncan (white)

<u>**Human Resources Managers ("HR Managers")**</u>

Kathleen Williamson (white)
(Compensation and Classification) (separated by September 1, 2003)

John Kunz (white)
(Compensation and Classification) (joined in September 2003)

Brenda Johnson (black)
(Benefits) (promoted in February 2003)

<u>**Human Resources Analysts ("HR Analysts")**</u>
*(Race/Sex; Salary; Years of State Experience)[25]*

Brenda Boone (black female; $38,158; 18+)

_____ Walker (white female; $37,786; 15+)

Gwendolyn Archibald (black female; $35,690; 10+)[26]

Jerenne Richards (white female; $34,904; 23+)

Joan Harrell (white female; $30,053; 11+)

<u>**Clerical Staff**</u>

Doretha Monroe (black)

---

[25]Sources: Milloy Confidential Memo. to Archibald; Duncan Aff. ¶ 10.

[26]Had she accepted a 5% raise, Archibald's salary would have been $37,475.